**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR INVESTIGATIVE REPORTING, <br><br>    Plaintiff, <br><br>    v. <br><br>U.S. CUSTOMS AND BORDER PROTECTION and U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br>    Defendants. | Civil Action No. 18-2901 (BAH) <br><br> Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

The plaintiff, Center for Investigative Reporting, a "nonprofit investigative journalism organization," Compl. ¶ 2, ECF No. 1, challenges the response of the defendants—the U.S. Department of Homeland Security and its component agency, U.S. Customs and Border Protection ("CBP")—to a request submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for "[a]ny and all submissions, records, documents, white papers, memoranda and/or alike material related to border fence/border wall contract proposals," Compl., Ex. A, Pl.'s FOIA Request ("FOIA Request"), ECF No. 1-1. The parties have now cross-moved for summary judgment. Defs.' Mot. Summ. J., ECF No. 14; Pl.'s Opp'n Defs.' Mot. & Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF Nos. 15, 16. For the reasons set forth below, summary judgment is granted to the defendants with respect to the information withheld pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E), which withholdings are no longer challenged by the plaintiff. Both the defendants' motion and the plaintiff's motion, however, are denied, without prejudice, with respect to the withholdings under FOIA Exemptions 4 and 5, which present novel issues about the FOIA Improvement Act of 2016, the Supreme Court's recent

1

decision in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), and the interrelation between these two recent developments in the law.

I.      BACKGROUND

The FOIA request at issue seeks records related to "the first implementation of President Donald Trump's intention to build an updated border wall." Compl. ¶ 9. Specifically, on March 17, 2017, CBP issued two Requests for Proposals ("RFPs") "to design and build prototypes for a new border wall on the U.S.-Mexico border near Chula Vista, California." Compl. ¶ 7; *see* Decl. of Shari Suzuki, CBP's Chief of the FOIA Appeals, Policy and Litigation Branch ("Suzuki Decl.") ¶ 7, ECF No. 14-3. In response, potential contractors ("bidders" or "submitters") submitted to CBP over 150 proposals, *see* Suzuki Decl. ¶ 14, which "included potential designs and materials to be used in construction, as well as more basic information about which companies were submitting proposals," Compl. ¶ 8.

The following month, on April 24, 2017, the plaintiff filed a FOIA request for "[a]ny and all submissions, records, documents, white papers, memoranda and/or alike material related to border fence/border wall contract proposals." FOIA Request. After conducting a search, the defendants located 6,762 pages of responsive records in three CBP components. Suzuki Decl. ¶¶ 11, 15. First, CBP's Office of Acquisition ("OA"), which "was responsible for overseeing the requests for proposals that are the subject of [the plaintiff's] request," *id*. ¶ 13, found 990 pages of responsive records, 946 pages of which were released in full and 44 pages in part, *id*. The OA responsive records "primarily consist of the successful proposals that were selected for contract award." *Id*. Next, CBP's Office of Facilities and Asset Management ("OFAM"), which "manages CBP's facilities and tactical infrastructure portfolios including fencing along the Southwest border," *id*. ¶ 12, found 101 pages of responsive records, 1 page of which was

released in full, 1 page of which was released in part, and 99 pages of which were withheld in full, *id*. The OFAM responsive records are predominantly made up of internal documents relating to the border wall. *See id.* ¶¶ 12, 28. Lastly, CBP's Office of Information Technology ("OIT"), which, *inter alia*, managed the email account that "served as the primary point of contact between the public and CBP for matters related to the border wall RFP's that are the subject of [the plaintiff's] request, including the submission of proposals," *id*. ¶ 14, found 5,671 pages of responsive records, *id*. Those records largely "consist[] of 152 unsuccessful proposals (i.e., the proposals that were not selected by CBP to be awarded a contract)," as well as emailed "questions and responses pertaining to the RFP's." *Id*. 72 pages of those records were released in full, while 5,489 pages were withheld in full and 110 pages withheld in part. *Id*. In sum, of the 6,762 pages of responsive records located in these three CBP offices, the defendants released 1,019 pages in full and 155 pages in part, and withheld 5,588 pages in full. *Id*. ¶ 15.

The defendants rely on FOIA Exemptions 3, 4, 5, 6, 7(C), and 7(E) as the basis for the redactions and withholdings, as set out in the defendants' *Vaughn* Index, *see* Suzuki Decl., Ex. A, *Vaughn* Index, ECF No. 14-3,[1] and further explained in two declarations from Sharon Suzuki, the Chief of CBP's FOIA Appeals, Policy and Litigation Branch, *see* Suzuki Decl.; Suppl. Decl. of Shari Suzuki, CBP's Chief of the FOIA Appeals, Policy and Litigation Branch ("Suppl. Suzuki Decl."), ECF No. 17-1. The plaintiff does not contest the withholdings under Exemptions 3, 6, 7(C), and 7(E), *see* Pl.'s Cross-Mot. at 1; Pl.'s Reply Supp. Pl.'s Cross-Mot. ("Pl.'s Reply") at 2 n.2, ECF No. 20, which exemptions account for all of the OA withheld

---

[1]     "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015). Pin citations to the defendants' *Vaughn* Index in this opinion refer to the document number that the defendants assigned to a document or set of documents.

records and the bulk of the OIT withheld pages.[2]  The plaintiff, however, challenges the defendants' decision to redact, pursuant to Exemptions 4 and 5, 110 pages of emails to CBP, found by OIT, asking questions and expressing concerns about the RFPs, *see Vaughn* Index # 25, and to withhold, pursuant to Exemption 5, 106 pages of internal OFAM and OIT documents relating to the border wall, *see id.* ## 3, 6–18, 20–21, 23–24, for a total of 216 challenged pages.[3]

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "In FOIA cases, summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."  *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced or is wholly exempt from the Act's inspection requirements.'" (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most FOIA cases will be resolved on summary judgment.  *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

---

[2]     For instance, the plaintiff concedes that 5,482 of the 5,588 withheld pages are bidders' proposals, *see Vaughn* Index # 26, properly withheld pursuant to Exemption 3, *see* Pl.'s Cross-Mot. at 1.

[3]     The 110 pages of emails were redacted pursuant to Exemptions 4, 5, 6, and 7(C). *Vaughn* Index # 25.  The defendants fail to specify how many of the pages contain redactions pursuant to Exemptions 4 and 5, which remain at issue, as opposed to Exemptions 6 and 7(C), about which there is no dispute.  *See id.*  Consequently, in any further review of the propriety of withholdings, the defendants are directed to identify the specific basis for withholding for each redaction on the 110 pages.

FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). To balance the public's interest in governmental transparency and "legitimate governmental and private interests [that] could be harmed by release of certain types of information," *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (internal quotation mark omitted) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA has nine exemptions, set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (citations omitted) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1979); and then quoting *Abramson*, 456 U.S. at 630). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). "FOIA places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (citations omitted) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of

establishing that the exemption applies"). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (alterations in original) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).[4]

## III.   DISCUSSION

The defendants' withholdings under both Exemption 4 and Exemption 5 implicate FOIA's relatively new statutory "foreseeable harm" requirement. The parties' briefing primarily addressed that requirement in discussion of Exemption 5, and thus that exemption is considered first.

### A.   Exemption 5

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental

---

[4]     The defendants suggest that "each fact" claimed in their Statement of Material Facts should be treated "as conceded" because the plaintiff failed to controvert the alleged facts in an opposing statement. Defs.' Reply Supp. Defs.' Mot. & Opp'n Pl.'s Cross-Mot. ("Defs.' Opp'n") at 2 n.2 (citing LCvR 7(h)(1)), ECF Nos. 17, 18. Yet, "on a summary judgment motion, '[f]acts not conclusively demonstrated, but essential to the movant's claim, are not established merely by his opponent's silence," *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999) (alteration in original) (quoting *Nat'l Assoc. of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)) (reversing grant of summary judgment on FOIA Exemption 4 claim), and "the District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment,'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1095 (D.C. Cir. 2019) (quoting *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016)). Here, the briefing makes clear those material facts continue to be disputed by the plaintiff. *See, e.g.*, Pl.'s Cross-Mot. at 3–5 (contesting defendants' claim as to harm that would be caused by release of withheld commercial information); *id.* at 6–9 (contesting defendants' claims as to harm that would be caused by disclosure of withheld internal documents).

attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). Here, the defendants invoke the deliberative process privilege, which permits an agency to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (internal quotation marks omitted) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)), in order that agencies may "craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public," *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 847 F.3d 735, 739 (D.C. Cir. 2017).

Pursuant to Exemption 5, the defendants have withheld in full 18 documents totaling 106 pages. *See Vaughn* Index ## 3, 6–18, 20–21, 23–24. These documents include, according to the defendants, "the interagency acquisitions supplement, best procurement approach for assisted acquisitions document, terms and conditions for assisted acquisitions document, border wall funding spreadsheets, interagency agreements, proposed responses to Congressional questions with edits, draft border wall communication and outreach strategy plan and outline, internal white paper documents pertaining to acquiring prototype wall designs, schedules pertaining to border wall matters, an internal risk register, [and] U.S. Border Patrol facilities and tactical infrastructure and Air and Marine PMO wall project requirement document." Suzuki Decl. ¶ 28. Additionally, the defendants have withheld, via redaction, portions of 110 pages of emails to CBP asking questions and expressing concerns about the RFPs. *See Vaughn* Index # 25.

7

While not expressly conceding that this withheld information is covered by the deliberative process privilege, the plaintiff makes little effort to dispute that claim. *See* Pl.'s Cross-Mot. at 6–9; Pl.'s Reply at 4–5. Instead, the plaintiff focuses its Exemption 5 arguments on the "foreseeable harm" requirement added to FOIA by the FOIA Improvement Act of 2016. *See, e.g.*, Pl.'s Cross-Mot. at 6. This choice is not surprising. As discussed *infra* in Part III.A.2.a., the foreseeable-harm requirement is a "heightened standard," *Judicial Watch, Inc. v. U.S. Dep't of Commerce* (*Judicial Watch I*), 375 F. Supp. 3d 93, 100 (D.D.C. 2019), and thus a FOIA requester may perceive a foreseeable-harm argument to be easier to advance than an argument about whether a FOIA exemption applies at the outset. Focusing exclusively on foreseeable harm, however, risks conflating an agency's failure to establish the basis for an exemption with failure to demonstrate foreseeable harm. In any event, the grant of summary judgment is inappropriate to any party unless the court is assured the record justifies this result, *see Figueroa*, 923 F.3d at 1095, and thus whether the withheld documents fall within Exemption 5's scope is considered first, before turning to foreseeable harm.

### 1. The Defendants Have Failed to Establish that Exemption 5 Applies

"To qualify for the deliberative process privilege, an intra-agency memorandum must be both pre-decisional and deliberative." *Abtew*, 808 F.3d at 898 (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). "A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates," *id.* (internal quotation marks omitted) (quoting *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987)), or was "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made," *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft,* 421 U.S.

168, 184 (1975)).  Deliberative, in this context, means the record is "a part of the agency give-and-take—of the deliberative process—by which the decision itself is made."  *Abtew*, 808 F.3d at 899 (internal quotation marks omitted) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).

To gauge whether the deliberative-process privilege has been asserted appropriately, the government must explain, for each withheld record, at least, "(1) 'what deliberative process is involved,' (2) 'the role played by the documents in issue in the course of that process,' and (3) 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents.'"  *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 147 (D.D.C. 2017) (citations omitted) (first quoting *Senate of P.R.*, 823 F.2d at 585–86; then quoting *id.*; and then quoting *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011)).  The government, not the requester, must identify the deliberative process to which any record relates.  *100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 152 (D.D.C. 2017) (citing *Coastal States*, 617 F.2d at 868).

Here, the defendants' Exemption 5 withholdings are insufficiently explained in three critical respects: the deliberative process to which the withheld records relate, the decisionmaking authority, and the chronology.

### a.    *The Defendants' Descriptions of the Deliberative Process*

"[T]o approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'"  *Senate of P.R.*, 823 F.2d at 585 (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983)); *see also Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) ("To justify its application of the

deliberative process privilege, an agency must address . . . the nature of the specific deliberative process involved . . . . " (internal quotation marks omitted) (quoting *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013))); *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013) ("[A] broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional."); *Elec. Frontier Found.*, 826 F. Supp. 2d at 168 ("The Court finds this description inadequate because it fails to identify a specific deliberative process to which the withheld email messages contributed.").  Indeed, the D.C. Circuit has said that "[t]he failure to specify the relevant final decision constitutes a sufficient ground for remanding [Exemption 5 deliberative process claims] to the district court."  *Senate of P.R.*, 823 F.2d at 585. "Without a sufficiently specific affidavit or *Vaughn* Index, a court cannot decide, one way or the other, a deliberative process privilege claim."  *Elec. Frontier Found.*, 826 F. Supp. 2d at 168 (internal quotation marks omitted) (quoting *Judicial Watch v. USPS*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004)).

The defendants maintain that the documents withheld pursuant to Exemption 5 contributed to "administering the evolving and ongoing border wall contracting, procurement, and construction process."  Suzuki Decl. ¶ 30; *see also, e.g.*, *Vaughn* Index # 3 (stating that documents were "part of administering the border wall contracting, procurement, and construction process").  An agency, the defendants argue, often "generate[s] memoranda containing recommendations which do not ripen into agency decisions," and thus the deliberative process privilege protects documents that "compris[e] part of a process by which governmental decisions and policies are formulated."  Suzuki Decl. § 29 (internal quotation marks omitted) (quoting *Sears*, 421 U.S. at 150, 151 n.18).  Such application of the deliberative process privilege

10

is called for here, the defendants further contend, because the withheld documents "contain information under consideration by CBP as the agency moved towards a decision on how to administer the evolving process." *Id.* ¶ 30.

The defendants have failed to identify the final decisions to which the withheld documents pertain. While the defendants are correct that the deliberative process privilege applies to documents that have not yet resulted in an agency decision, the withheld records here "may in fact pertain to a litany of subsidiary decisions that defendants fail to acknowledge." *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 376 F. Supp. 3d 47, 67 (D.D.C. 2019); *see also 100Reporters LLC*¸ 248 F. Supp. 3d at 153 (rejecting agency argument that "would create a four-year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions"). The defendants' own declaration refers to the "ongoing process" to which the documents relate as a three-fold "*contracting, procurement, and construction process.*" Suzuki Decl. ¶ 30 (emphasis added). Moreover, some of the document descriptions in the defendants' *Vaughn* Index create the impression that the documents at issue might themselves *be* final subsidiary agency decisions. *See, e.g.*, *Vaughn* Index # 8 ("The unsigned documents set forth terms and conditions governing assisted acquisitions."). In short, the defendants have not identified the "subsidiary decisions that fall underneath the nebulous umbrella process [they] ha[ve] purported to identify," *100Reporters LLC*, 248 F. Supp. 3d at 153, and thus they have not carried their burden.

### b.      *The Defendants' Descriptions of Decisionmaking Authority*

Explaining decisionmaking authority is an essential ingredient to justifying withholdings under the deliberative process exemption. The D.C. Circuit has been clear that "[a] key feature under both the 'predecisional' and 'deliberative' criteria is the relation between the author and

11

recipients of the document. A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); *see also Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982) ("To establish that documents do not constitute the 'working law' of the agency, the agency must present to the court . . . 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s),' . . . and the positions in the chain of command of the parties to the documents." (quoting *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 679 (D.C. Cir. 1981))); *Assassination Archives & Research Ctr. v. CIA*, 781 F. App'x 11, 13 (D.C. Cir. 2019) (per curiam) ("[W]e have described a 'recommendation to a supervisor on a matter pending before the supervisor' as 'a classic example of a deliberative document.'" (quoting *Abtew*, 808 F.3d at 899)).

The defendants have made essentially no effort to satisfy the "key feature" by identifying "the relation between the author and recipients of the document." *Access Reports*, 926 F.2d at 1195. Indeed, in almost every instance the defendants have "wholly omitted information about the positions and responsibilities of the authors and recipients . . . of the records." *Judge Rotenberg Educ. Ctr.*, 376 F. Supp. 3d at 68 (internal quotation marks omitted). True, the defendants note that some of the documents at issue are unsigned, *see Vaughn* Index ## 3, 6–9, 13, but the defendants do not make this claim for every document withheld or redacted pursuant to Exemption 5, *see Vaughn* Index ## 10–12, 14–18, 20–21, 23–25. For the latter records, the defendants still do not identify the author to assess the deliberative nature of the contents. Nor have the defendants explained (1) whether they have other ways to identify the authors of the

unsigned documents and (2) why the absence of *author* signatures prevents the defendants from being able to identify the *recipients* of the documents. Accordingly, the defendants have again failed to explain the basis for the exemption well enough to assess whether it has been properly claimed.

### c. The Defendants' Descriptions of the Chronology

As noted, for a document to qualify for the deliberative process privilege, it must "precede[], in temporal sequence, the 'decision' to which it relates." *Abtew*, 808 F.3d at 898 (internal quotation mark omitted) (quoting *Senate of P.R.*, 823 F.2d at 585). To ensure that this chronology is established, "typically, a comprehensive *Vaughn* index will at least include . . . [a document's] date." *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 144. While "there is no fixed rule establishing what a *Vaughn* index must look like," *ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013), and "an agency need not even create a *Vaughn* Index to justify withholdings," *Judge Rotenberg Educ. Ctr.¸* 376 F. Supp. 3d at 65, an agency must establish the chronological relation between the document and the relevant decision with "specificity and [in] detail," *Senate of P.R.*, 823 F.2d at 585 (alteration in original) (internal quotation marks omitted) (quoting *Parke, Davis & Co. v. Califano*, 623 F.2d 1, 6 (6th Cir. 1980)). Given that the defendants have not identified the specific final agency decisions to which the documents withheld and redacted pursuant to Exemption 5 relate, they have, by extension, failed to establish that the documents predated those final decisions.

* * *

The defendants have not shown that the documents withheld and redacted pursuant to Exemption 5 are covered by the deliberative process privilege. The insufficiencies in the defendants' *Vaughn* Index and declarations are such that *in camera* review may prove necessary.

13

Nevertheless, the defendants will be allowed another opportunity to supplement the record to avoid that step.

## 2. The Defendants Have Not Demonstrated Foreseeable Harm

The defendants have also failed to satisfy FOIA's "foreseeable harm" requirement. Review of the origins of the foreseeable-harm requirement and the limited caselaw to date considering its application is helpful in demonstrating the insufficiency of the defendants' foreseeable-harm justification.

### a. The Foreseeable-Harm Requirement

The foreseeable-harm requirement began not as a creation of the Legislative Branch, but of the Executive. Upon assuming office in 2009, then-President Barack Obama issued direction to Executive Branch agencies on implementation of FOIA. Emphasizing that FOIA reflects a "profound national commitment to ensuring an open Government," he instructed agencies to administer FOIA "with a clear presumption: In the face of doubt, openness prevails." Memorandum on the Freedom of Information Act, 74 Fed. Reg. 4683, 4683 (Jan. 21, 2009) [hereinafter 2009 Presidential Memorandum].

Shortly thereafter, then–Attorney General Eric Holder implemented the President's directive by establishing the foreseeable-harm requirement. *See* Memorandum from Eric Holder, Attorney Gen., U.S. Dep't of Justice, to Heads of Exec. Dep'ts & Agencies (Mar. 19, 2009), https://www.justice.gov/sites/default/files/ag/legacy/2009/06/24/foia-memo-march2009.pdf [hereinafter 2009 DOJ Memorandum]. In his memorandum to Executive Branch agencies, Attorney General Holder explained that to "realize[]" the "presumption of openness" "in practice," "an agency should not withhold information simply because it may do so legally" or "merely because it can demonstrate, as a technical matter, that the records fall within the scope

14

of a FOIA exemption." *Id.* at 1 (capitalization altered).  Rather, the Department of Justice would now "defend a denial of a FOIA request only if (1) the agency reasonably fores[aw] that disclosure would harm an interest protected by one of [FOIA's] statutory exemptions, or (2) disclosure [was] prohibited by law." *Id.* at 2.

Despite the Executive Branch's efforts to self-regulate, Congress remained concerned that "agencies [we]re overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure." S. REP. NO. 114-4, at 2 (2015), *as reprinted in* 2016 U.S.C.C.A.N. 321, 322; *see also* H.R. REP. NO. 114-391, at 9 (2016) ("Unfortunately, there is concern that agencies are overusing these exemptions to protect records that should be releasable under the law.").[5]  While some agencies had "made an effort to comply with the letter of the law, very few ha[d] complied with the spirit of the law," and had instead "taken advantage of [FOIA's] exemptions to withhold any information that might technically fit," 162 CONG. REC. H3717 (2016) (statement of Rep. Meadows), resulting in a "growing and troubling trend" of invoking FOIA exemptions "even though no harm would result from disclosure,'" S. REP. NO. 114-4, at 3.

Congress was especially concerned about agencies' reliance on Exemption 5 and the deliberative process privilege.  The Senate Report, for instance, noted that agencies had invoked Exemption 5 "more than 79,000 times in 2012—a 41% increase from the previous year." *Id.* The House Report, similarly, pointed to "[e]xemption five . . . as a particularly problematic

---

[5]     The version of the legislation reported by the House Committee on Oversight and Government Reform placed the new foreseeable-harm requirement within subsection 552(b), rather than 552(a), and used slightly different language.  *See* H.R. REP. NO. 114-391, at 32 (amending the last paragraph of 5 U.S.C. § 552(b) to add: "An agency may not withhold information under this subsection unless such agency reasonably foresees that disclosure would cause specific identifiable harm to an interest protected by an exemption, or if disclosure is prohibited by law.").  By contrast, the foreseeable-harm requirement reported by the Senate Judiciary Committee is identical to the enacted version in placement and closely tracks the enacted language, which was introduced as a substitute amendment by two of the Senate sponsors and passed by unanimous consent in the Senate.  *See* 162 CONG. REC. S1508–10 (2016).  Consequently, review of the legislative history regarding implementation of the foreseeable-harm requirement relies most heavily on the Senate Report.

exemption," and explained further that "[t]he deliberative process privilege is the most used privilege and the source of the most concern regarding overuse." H.R. REP. No. 114-391, at 10 ("Some have taken to calling [Exemption 5] the 'withhold it because you want to' exemption.").[6]

The solution to this problem, Congress decided, was to make the "presumption of openness" established by the 2009 Presidential Memorandum "a permanent requirement for agencies, with respect to FOIA." *Id.* at 9; *see also* S. REP. No. 114-4, at 7 (explaining that the FOIA Improvement Act adopts "the policy established for releasing Government information under FOIA by President Obama when he took office in January 2009 and confirmed by Attorney General Holder in a March 19, 2009, Memorandum to all Executive Departments and Agencies"). Doing so, Congress believed, would ensure that "the content of a particular record [w]ould be reviewed and a determination made as to whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interested protected by the applicable exemption." S. REP. No. 114-4, at 8. It would also, Congress explained, ensure that agencies could not withhold documents based on "mere 'speculative or abstract fears,' or fear of embarrassment." *Id.* (quoting 2009 Presidential Memorandum, 74 Fed. Reg. at 4683).

Accordingly, the FOIA Improvement Act "codified the 'foreseeable harm' standard established in 2009 by then Attorney General Holder for defending agency decisions to withhold

---

[6] To further address concern about overuse of Exemption 5's deliberative process privilege, the FOIA Improvement Act also added a sunset provision to limit the applicability of this privilege, which "shall not apply to records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5). Earlier versions of the legislation reported by both the Senate Judiciary Committee and House Committee on Oversight and Government Reform would have applied this sunset more broadly to any invocation of Exemption 5. *See* S. REP. No. 114-4, at 10 (explaining that bill would "amend[] Exemption 5 to include a sunset provision, which would limit the application of Exemption 5 to documents created less than 25 years ago," "includ[ing] but . . . not limited to the attorney-client privilege, the attorney work product doctrine, and deliberative process documents"); H.R. REP. No. 114-391, at 11 ("Agencies could only apply exemption five to records and information created within 25 years prior to the date of the request regardless of the underlying privilege relied upon.").

16

information." *Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018); *see, e.g.*, S. REP. NO. 114-4, at 3 & n.8 (2015) (citing 2009 DOJ Memorandum). Specifically, subsection (a)(8)(A)(i) of FOIA—mirroring the language employed by Attorney General Holder—provides that "[a]n agency shall . . . withhold information under this section only if . . . (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). Subsection (a)(8)(B) further explains that "[n]othing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3)," which exempts classified information from disclosure under FOIA. *Id.* § 552(a)(8)(B). Subsection (b) of FOIA, enumerating the FOIA exemptions, then immediately follows. *See id.* § 552(b). In sum, FOIA now requires that an agency "release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law." *Judicial Watch, Inc. v. U.S. Dep't of Justice* (*Judicial Watch II*), No. 17-cv-0832 (CKK), 2019 WL 4644029, at *3 (D.D.C. Sept. 24, 2019) (internal quotation mark omitted) (quoting *Rosenberg*, 342 F. Supp. 3d at 73); *see also Judicial Watch I*, 375 F. Supp. 3d at 100 (similar).

Consistent with Congress's concern about agencies' over-withholding under Exemption 5, nearly all of the few decisions to have addressed the new foreseeable-harm requirement at any length have done so when considering the Exemption 5 deliberative-process privilege.[7] Three

---

[7] Two cases have addressed this new statutory requirement as applied to Exemption 4 and, particularly, the extent to which the foreseeable-harm requirement replaces the competitive-harm test rejected as without any statutory basis by the Supreme Court in *Food Marketing*. *See Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, No. 4:19-cv-01843-KAW, 2019 WL 6716352, at *6–7 (N.D. Cal. Dec. 10, 2019); *Am. Small Bus. League v. U.S. Dep't of Defense*, No. C 18-01979 WHA, 2019 WL 6255353, at *7–8 (N.D. Cal. Nov. 24, 2019). This issue is discussed in more detail *infra* in Part III.B.2.b.

key principles may be gleaned from those decisions, which though non-binding are persuasive, as guiding application of the foreseeable-harm requirement. First and foremost, the foreseeable-harm requirement "impose[s] an independent and meaningful burden on agencies." *NRDC v. EPA*, No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019); *see also, e.g.*, *Judicial Watch I*, 375 F. Supp. 3d at 100 (describing the new foreseeable-harm requirement as a "heightened standard"). Indeed, as the foregoing legislative history illustrates, the text, history, and purpose of the FOIA Improvement Act confirm that the foreseeable-harm requirement was intended to restrict agencies' discretion in withholding documents under FOIA. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."). Second, to meet this independent and meaningful burden, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[] the harms in [a] meaningful way to the information withheld." *Judicial Watch II*, 2019 WL 4644029, at *5; *see* H.R. REP. NO. 114-391, at 9 ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld."). Third and finally, agencies "may take a categorical approach" and "group together like records," *Rosenberg*, 342 F. Supp. 3d at 78, but when using a categorical approach, an agency must provide more than "nearly identical boilerplate statements" and "generic and nebulous articulations of harm," *Judicial Watch II*, 2019 WL 4644029, at *4–5.

### b.	*The Defendants' Foreseeable-Harm Claims*

Here, the defendants' claims of foreseeable harm consist of "general explanations" and "boiler plate language," *Judicial Watch I¸* 375 F. Supp. 3d at 100, that do not satisfy the foreseeable-harm requirement. For instance, *every* Exemption 5 entry in the defendants' *Vaughn* Index recites the following three sentences, with only slight variation, as the justification for withholding the documents at issue:

> [T]he documents were withheld from disclosure because the information in the documents is predecisional and deliberative in that it consists of evaluations, opinions, observations, and other findings that CBP employees deemed critical as part of administering the border wall contracting, procurement, and construction process. Releasing these documents could result in confusion regarding reasons and rationales that may not ultimately be the grounds for any actions CBP may take regarding the contracting, procurement, and construction process. Moreover, release could chill open and frank discussions among CBP employees.

*Vaughn* Index ## 3, 6–18, 20–21, 23–25. The defendants' declarations, likewise, contain "generic, across-the-board articulations of harm," *NRDC*, 2019 WL 3338266, at \*1, that largely repeat statements already found in the *Vaughn* Index, *see, e.g.*, Suzuki Decl. ¶ 30 ("[R]eleasing these documents could result in confusion regarding reasons and rationales that may not ultimately be the grounds for any actions the agency may take regarding the ongoing process."); Suppl. Suzuki Decl. ¶ 10 ("Release of the information and documents that were withheld under Exemption (b)(5) would . . . impair[] CBP employees [sic] ability to perform their duties with candor and without the fear of reprisal" and "creat[e] confusion with the public by disseminating policies and proposals that are not ultimately adopted."). Even the defendants candidly admit that the claim that "particular records could 'chill open and frank discussions among CBP employees'" is merely a "general statement." Defs.' Opp'n at 6 (quoting Suzuki Decl. ¶ 30).

If the defendants wish to establish foreseeable harm when they supplement the record, they will need to provide "context or insight into the specific decision-making processes or

deliberations at issue, and how they in particular would be harmed by disclosure." *Judicial Watch II*, 2019 WL 4644029, at \*5; *see also NRDC v. EPA*, No. 17-CV-5928 (JMF), 2019 WL 4142725, at \*5 (S.D.N.Y. Aug. 30, 2019) (finding foreseeable-harm requirement satisfied where agency gave "context for the decisionmaking processes in question and the harms that would reasonably ensue from disclosure of the material"). In some instances, the foreseeable-harm claims the defendants have already provided—once attached to a more detailed document description that includes, *inter alia*, the information the defendants must already provide to enable assessment of whether the deliberative process privilege was properly asserted in the first instance—may be enough. In *Rosenberg*, for example, "the court [could] readily see" the harm presented by "disclosure of the internal deliberations between [the general who served as commander of American military operations in Central America, South America, and the Caribbean] and high-ranking [Department of Defense] officials about 'a possible new detention operation in the continental United States.'" 342 F. Supp. 3d at 79. In other instances, though, it will not be "axiomatic," Defs.' Opp'n at 7, that disclosure would cause the harms that the defendants claim, particularly since the successful bidders for the RFPs have already been selected and the bids awarded, *see* Suzuki Decl. ¶ 13.

Entry # 17 on the defendants' *Vaughn* Index well illustrates these two possibilities. There, the defendants state that they have withheld a "[o]ne-page email [that] sets forth an estimate of the dollar amount that will be required for prototype testing." *Vaughn* Index # 17. The defendants do not explain, however, *inter alia*, who prepared the estimate, how the estimate was calculated, how CBP employees reacted to the estimate, and how the estimate was ultimately used in the planning and selection process. Perhaps the email contains candid assessments sent by a subordinate to a superior about the key assumptions underlying the cost

20

estimate, in which event the defendants' explanation that disclosure would "result in confusion regarding reasons and rationales that may not ultimately be the grounds for any actions CBP may take" and "chill open and frank discussions among CBP employees" may suffice. *Id.* On the other hand, perhaps the email contains nothing except the dollar estimate itself for prototype testing. In that scenario, the information might *not* be, as the defendants argue, likely to cause confusion, particularly since the bids for the RFPs have already been accepted, and, in fact, relevant to citizens' consideration of the merits of the current border wall policy and the effectiveness with which that policy is carried out. The defendants must explain why the "presumption of openness" is overcome in such a context.

\* \* \*

In light of the defendants' failure to explain sufficiently the basis of their Exemption 5 withholdings and to show foreseeable harm, their motion for summary judgment must be denied with respect to Exemption 5.

### B.  Exemption 4

Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Where withheld records do not contain trade secrets, an agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential" to sustain the burden of showing that Exemption 4 was properly applied. *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

Here, the defendants have withheld two groups of documents pursuant to Exemption 4. First, they have withheld portions of the unsuccessful proposals submitted in response to the RFPs. *Vaughn* Index # 26. Second, they have withheld a "small amount of Exemption [4]

21

information" from 110 pages of "emails," Suppl. Suzuki Decl. ¶ 7, sent to

BorderWallDesignBuild@cbp.dhs.gov asking "questions" and expressing "concerns" about the

RFPs, *Vaughn* Index # 25. The plaintiff concedes that the first set of documents—the

proposals—were properly withheld in full under FOIA Exemption 3, rendering consideration of

whether portions of those documents were also properly withheld pursuant to Exemption 4

unnecessary. *See* Pl.'s Cross-Mot. at 1; *Vaughn* Index # 26. Thus, the current Exemption 4

dispute concerns only the information withheld pursuant to Exemption 4 in the question-and-

concern emails. The plaintiff agrees that this information is "commercial" and was "obtained

from a person," but contests whether it is "confidential." *See* Pl.'s Cross-Mot. at 3–5.[8] Thus,

whether Exemption 4 applies to this information turns on this question.

### 1. *Critical Mass* Provides the Governing Legal Standard

Until recently, the test used in this Circuit to determine whether commercial or financial

information is "confidential" for the purpose of FOIA Exemption 4 rested on whether the

information was submitted to the government involuntarily or voluntarily. When an entity

submitted commercial or financial information to the government *involuntarily*, such information

could be deemed "confidential" if its disclosure was likely "to cause substantial harm to the

competitive position of the person from whom the information was obtained." *Nat'l Parks &*

*Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). By contrast, when an entity

submitted commercial or financial information to the government *voluntarily*, the less-

demanding test from *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d

871 (D.C. Cir. 1992) (en banc), applied. Such information was "'confidential' for the purpose of

---

[8] Under 5 U.S.C. § 551(2), a "'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency." *Id*.

Exemption 4" merely if the information was "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Id.* at 879.

The parties do not dispute that here, the information withheld under Exemption 4 was involuntarily submitted because CBP "dictated the contents of the submissions." Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 9, ECF No. 14-1; *see also* Pl.'s Cross-Mot. at 3. Accordingly, the *National Parks* test would apply under the framework described above. *See* Defs.' Mem. at 9–10; Pl.'s Cross-Mot. at 4. Recently, however, the Supreme Court overruled *National Parks* in *Food Marketing*. 139 S. Ct. 2356. Explaining that it could not "discern a persuasive reason to afford the *same* statutory term two . . . radically different constructions," *id.* at 2365 (emphasis in original), the Court applied the "'ordinary, contemporary, common meaning'" that "confidential" had "when Congress enacted FOIA in 1966," *id.* at 2362 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)), and set forth a single test for determining whether information—regardless whether voluntarily or involuntarily submitted to the government—is confidential under Exemption 4. Specifically, "commercial or financial information" is confidential for the purpose of Exemption 4 when it is "both customarily and actually treated as private by its owner," and, perhaps as well, "provided to the government under an assurance of privacy." *Id.* at 2366.[9]

No decision in this Circuit has yet grappled with the ramifications of *Food Marketing*.[10] Nevertheless, assessing the defendants' assertion that the information withheld under Exemption 4 is confidential is not done on a blank slate. As the Supreme Court explained, the D.C. Circuit

---

[9] The Supreme Court did not ultimately decide whether an "assurance of privacy" is in fact necessary for information to be confidential within the meaning of Exemption 4. *See Food Mktg.*, 139 S. Ct. at 2363. This potential requirement is discussed *infra* in Part III.B.2.b.

[10] *Tokar v. U.S. Department of Justice*, 16-cv-2410 (RC), 2019 WL 6910142 (D.D.C. Dec. 19, 2019), recently applied *Food Marketing*, but addressed the case only briefly in a footnote and did not need to consider the issues discussed here. *See id.* at *4 n.7.

23

never "extend[ed] the *National Parks* test to information provided *voluntarily* to the government under Exemption 4." *Id.* at 2365 (emphasis in original). Instead, and as noted above, the D.C. Circuit has long held that voluntarily submitted information is governed by the test found in *Critical Mass*, which "adhered to a much more traditional understanding of the statutory term 'confidential.'" *Id.* (citing *Critical Mass*, 975 F.2d at 879–80). The import of *Food Marketing*'s holding that the ordinary meaning of "confidential" applies in *all* Exemption 4 cases, then, is clear: *Critical Mass* and its progeny now supply the framework in this Circuit for determining whether voluntarily submitted *and* involuntarily submitted commercial or financial information are "confidential" under Exemption 4. Accordingly, *Critical Mass* and its progeny will be applied to resolve the defendants' confidentiality claims.

### 2. The Defendants Fail to Meet the *Critical Mass* Standard

As explained above, under *Critical Mass* commercial or financial information is "'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." 975 F.2d at 879. This test "is objective," and "the agency invoking Exemption 4 must meet the burden of proving the provider's custom." *Id.* "In addition, in assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass*, 975 F.2d at 872, 878–80)); *see also Food Mktg.*, 139 S. Ct. at 2363, 2366 (explaining that "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by *the person* imparting it," *id.* at 2363 (emphasis added), that "it is hard to see how information could be deemed confidential if *its owner* shares it freely," *id.* (emphasis added), and that "commercial or

24

financial information" is "'confidential' within the meaning of Exemption 4" "[a]t least where," *inter alia*, the information is "customarily and actually treated as private by *its owner*," *id.* at 2366 (emphasis added)). Here, the defendants have failed to meet this standard.

### a. *The Defendants' Declarations Lack Sufficient Foundation*

The defendants rely on the declarations submitted by Sharon Suzuki, the Chief of CBP's FOIA Appeals, Policy and Litigation Branch, to establish that the information withheld under Exemption 4 is of the type that the submitters customarily treat as private. *See, e.g.*, Defs.' Opp'n at 4 (citing Suzuki Decl. ¶ 21; Suppl. Suzuki Decl. ¶¶ 7, 8). Suzuki states that documents withheld or redacted under Exemption 4 contain "information that a submitter would not want released to competitors." Suzuki Decl. ¶ 25. "[T]he unsuccessful bidders have a strong interest in maintaining confidential treatment for [this] information," according to Suzuki, Suppl. Suzuki Decl. ¶ 7, especially because "[m]any of the unsuccessful bidders for this project may bid on future border wall projects" and "[r]eleasing the information contained in the bidders' proposals . . . will undercut their ability to obtain future border wall contracts," *id.* ¶ 8. The plaintiff, however, points out that Suzuki is a CBP employee, and that the defendants "offer no declarations from the submitters themselves." Pl.'s Cross-Mot. at 4. "[A]gency declarations" alone, the plaintiff argues, "or at least ones lacking foundation as is the case here," are "inadequate" in the Exemption 4 context, Pl.'s Reply at 2, and thus the defendants have failed to carry their burden.

The plaintiff is correct that the Suzuki declarations lack sufficient foundation to support the defendants' confidentiality claim. To establish submitter custom for purposes of Exemption 4, "it is sufficient for an agency to proceed solely on its sworn affidavits." *Judicial Watch, Inc. v. U.S. Dep't of Commerce* (*Judicial Watch III*), 337 F. Supp. 2d 146, 171 (D.D.C. 2004). Yet,

25

as is the case for all affidavits, such agency affidavits must "be made on personal knowledge." *Animal Legal Def. Fund, Inc. v. Dep't of the Air Force*, 44 F. Supp. 2d 295, 303 (D.D.C. 1999) (quoting FED. R. CIV. P. 56(e)). Such personal knowledge can be demonstrated in various ways, including by relaying that the submitters themselves told the agency that the information is confidential, *see ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 138 (D.D.C. 2008); Decl. of Richard C. Beaird ¶¶ 27, 31, *ICM Registry, LLC*, 538 F. Supp. 130 (No. 06-cv-0949 (JR)), ECF No. 19-1, by indicating that the agency reached an "understanding" with the submitters "that the information w[ould] be held in confidence by the U.S. and not publicly divulged," *Judicial Watch III*, 337 F. Supp. 2d at 171 (internal quotation marks omitted), by pointing to confidential markings on the documents themselves or to the existence of a non-disclosure agreement, *see Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 64 (D.D.C. 2015); *Cooper v. U.S. Dep't of the Navy*, No. 05-cv-2252 (EGS), 2007 WL 1020343, at \*5 (D.D.C. Mar. 30, 2007), or by providing descriptions of the documents that demonstrate their confidential nature, *see, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 306 F. Supp. 2d 58, 68 (D.D.C. 2004). Conclusory statements by an agency official about what the agency official may believe about how a submitter customarily treats the information at issue are simply insufficient.[11]

The defendants provide no foundation for their confidentiality claims. They do not, for instance, indicate that the submitters told CBP that portions of the questions and concerns were

---

[11] Relevant guidance issued to federal agencies by the Department of Justice's Office of Information Policy ("OIP") is in accord. *See* Office of Info. Policy, U.S. Dep't of Justice, *Exemption 4 after the Supreme Court's Ruling in* Food Marketing Institute v. Argus Leader Media (last updated Oct. 4, 2019), https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media [hereinafter OIP Guidance]. OIP advises: "Often an agency can determine whether this [confidentiality] condition is met based on its own knowledge of the information, the submitter's practices, and/or from the records themselves. Agencies may also seek additional information from the submitter about its practices. And as [*Food Marketing*] itself demonstrates, industry representatives can provide the necessary information regarding the customary treatment of such information." *Id.*

confidential. Nor do the defendants point to an understanding with the submitters that questions and concerns sent to the general "point of contact between the public and CBP for matters related to the border wall RFP's," Suzuki Decl. ¶ 14, would be kept confidential. In fact, a reasonable submitter may well have assumed that information stored in such a public-facing email account would *not* be confidential by default. While Suzuki does state, in her first declaration, that some of the information withheld pursuant to Exemption 4 "reveal[s] the competitive vulnerabilities and operational capabilities of" the submitters, *id.* ¶ 25, that statement is borderline conclusory, and in any event, a later statement in the same paragraph creates the impression that Suzuki's claim refers only to the portions of the *proposals* withheld pursuant to Exemption 4, not to the portions of the question-and-concern emails that were withheld, *see id.* ("[M]any of the *proposals* that were submitted contained innovative, novel, and proprietary information that a submitter would not want released to competitors." (emphasis added)). Without a firm foundation, the defendants' confidentiality claims must fail.

### b.    *The Defendants' Declarations Suffer from Additional Deficiencies*

The defendants' declarations suffer from additional deficiencies with respect to the Exemption 4 withholdings. First, contravening the D.C. Circuit's command that an agency show "how the *particular* party customarily treats the information," *Ctr. for Auto Safety*, 244 F.3d at 148 (emphasis added), the defendants base their confidentiality claim on "how the industry as a whole treats the information," *id.*; *see* Defs.' Opp'n at 4. Defendants argue that "there can be no debate that *a* company customarily keeps private the types of information contained in the withheld records," Defs.' Opp'n at 4 (emphasis added), not that *these* specific companies customarily do so. True, another of the defendants' contentions, read in isolation, comes closer to addressing the appropriate legal standard, *see id.* (arguing that "*the* submitters 'have a strong

27

interest in maintaining confidential treatment for their information'" (emphasis added) (quoting Suppl. Suzuki Decl. ¶ 7)), but in the broader context of the defendants' argument, that statement—preceded by the claim about industry practice—is at best ambiguous as to whether it in fact refers to the practices of these submitters. Given that the defendants carry the burden of proof, this ambiguity does not meet the *Critical Mass* standard.

Second, the confidentiality interest cited by the defendants might be too narrow to cover all the withheld information. The defendants contend only that *unsuccessful* bidders have an interest in keeping their information private. *See, e.g.*, Suppl. Suzuki Decl. ¶ 7 ("Here, the *unsuccessful* bidders have a strong interest in maintaining confidential treatment for their information . . . ." (emphasis added)); *id.* ¶ 8 ("Many of the *unsuccessful* bidders for this project may bid on future border wall projects." (emphasis added)). They never claim, however, that unsuccessful bidders submitted the redacted questions and concerns. Perhaps some—or even all—the submitters of the redacted questions and concerns were successful bidders, or potential bidders who ultimately decided not to respond to the RFPs. Considering that the defendants have not claimed that these types of submitters have an interest in keeping their information confidential, they have again failed to satisfy *Critical Mass*.

Third, the defendants have not satisfied a potential additional requirement recently highlighted by the Supreme Court. In *Food Marketing* the Supreme Court indicated that "*two* conditions . . . might be required for information communicated to [the government] to be considered confidential" under Exemption 4, 139 S. Ct. at 2363 (emphasis added): that the information is "customarily and actually treated as private by its owner," *id.* at 2366, *and* that the information was "provided to the government under an assurance of privacy," *id.* The Supreme Court stopped short, however, of deciding that Exemption 4 does in fact impose this second

28

requirement, *see id.* at 2363, perhaps because when information is involuntarily submitted to the government, the government often does not provide an assurance of privacy in return. By waiting until another day to determine whether and when this requirement applies, the Supreme Court left room to treat involuntarily submitted information and voluntarily submitted information differently from one another.

Regardless of the Supreme Court's reason for not resolving whether the government's "assurance of privacy" is required under Exemption 4, the defendants here acknowledge that in light of *Food Marketing*, they might need to show that they "provide[d] some assurance" to the submitters that the withheld information would "remain secret." Defs.' Opp'n at 4 n.3 (internal quotation mark omitted) (quoting *Food Mktg.*, 139 S. Ct. at 2363). Nevertheless, the defendants offer no evidence that such assurance was ever provided. The closest they come to doing so is to note that "federal procurement law expressly protects the confidentiality of proposals submitted in response to Federal Government Requests for Proposals," Defs.' Opp'n at 4–5 (citing 41 U.S.C. § 4702; 48 C.F.R. § 24.202(a)), but they do not claim that the submitters understood that questions and concerns expressed to a public-facing government email address about the RFPs would be covered by the provisions the defendants cite. Indeed, if those provisions did apply, the defendants could and presumably would have relied on Exemption 3 in addition to Exemption 4 to withhold this information, as they did for the proposal documents. *See* Suzuki Decl. ¶ 20 (explaining that the defendants withheld proposal documents under Exemption 3 because of 41 U.S.C. § 4702). Given that the defendants' declarations are already deficient for other reasons, at this stage "there's no need to resolve," *Food Mktg.*, 139 S. Ct. at 2363, whether Exemption 4 in fact imposes an "assurance of privacy" requirement. Suffice to say that *if*

Exemption 4 does so, the defendants must supply at least *some* evidence that this assurance was given.[12]

Finally, the plaintiff argues with respect to the Exemption 4 withheld information, as with the Exemption 5 withholdings, *supra*, in Part III.A.2, that the defendants have failed to satisfy FOIA's foreseeable-harm requirement. *See* Pl.'s Cross–Mot. at 5; Pl.'s Reply at 2–3. The FOIA Improvement Act's "foreseeable harm" requirement replaces to some extent the "substantial competitive harm" test that the Supreme Court overruled in *Food Marketing*. *Food Marketing* itself addressed a claim that arose prior to the enactment of the FOIA Improvement Act, and thus the Supreme Court had no opportunity to consider the foreseeable-harm requirement. The dissent, though—while agreeing with the majority that the D.C. Circuit's rejected substantial competitive harm test went "too far," *Food Mktg.*, 139 S. Ct. at 2367 (Breyer, J., concurring in part and dissenting in part)—stressed that "a tool used to probe the relationship between government and business should not be unavailable whenever government and business wish it so," particularly "given the temptation, common across the private and public sectors, to regard as secret all information that need not be disclosed," *id*. at 2368.

The foreseeable-harm requirement, as applied to Exemption 4, enhances the useful "tool" of FOIA. To meet this requirement, the defendants must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing "genuine harm to [the submitter's] economic or business interests," *id.* at 2369, and thereby dissuading others from submitting similar information to the government, *see Nat'l Parks*, 498 F.2d at 768 (explaining that Exemption 4 "is intended to

---

[12]    This analysis, again, comports with OIP guidance stating that "agencies should as a matter of sound administrative practice consider both [*Food Marketing*] conditions in the process of determining whether to invoke Exemption 4's protection for 'confidential' commercial or financial information." OIP Guidance.

encourage individuals to provide certain kinds of confidential information to the Government" (quoting *Soucie v. David*, 448 F.2d 1067, 1078 (D.C. Cir. 1971), and to "protect[] persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication").

At this stage, the defendants have not established that the withheld information falls within the scope of Exemption 4 in the first instance. Thus, they have, *a fortiori*, failed to satisfy the "heightened" foreseeable-harm requirement as well. *See, e.g.*, *Judicial Watch I*, 375 F. Supp. 3d at 100. For these reasons, the defendants' summary judgment motion must be denied with respect to Exemption 4.

### C.    Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure. 5 U.S.C. § 552(b). Producing segregable information is an essential ingredient for agencies' FOIA compliance, and "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (alteration in original) (internal quotation marks omitted) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)); *see also Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) (explaining that a district court has "an affirmative duty to consider the segregability issue *sua sponte*" (internal quotation marks omitted) (quoting *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F. 3d 1022, 1028 (D.C. Cir. 1999)). For those findings, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117.

31

Even with that presumption, "the agency must provide a 'detailed justification' for its non-segregability" but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice. *Id.* (internal quotation marks omitted); *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").

With respect to the information that the plaintiff concedes was properly withheld—*i.e.*, the information withheld pursuant to Exemptions 3, 6, 7(C), and 7(E)—the defendants have provided a sufficiently detailed attestation about the segregability of the withheld information. The defendants' declarant, Suzuki, has certified that she "reviewed the documents line-by-line, to identify information exempt from disclosure or for which a discretionary waiver of exemption could apply," and that she was "satisfied that all reasonably segregable portions of the relevant records have been released to the Plaintiff in this matter." Suzuki Decl. ¶ 42. Further, with regard to the 4,999 pages that the defendants have withheld under both Exemption 3 and Exemption 4, the defendants have made clear that these pages were withheld in their entirety pursuant to Exemption 3, making the Exemption 4 withholdings duplicative. *See id.* ¶ 22; Suppl. Suzuki Decl. ¶ 7; *see also* Defs.' Opp'n at 2. Suzuki's statements are corroborated by the fact that the defendants have released 1,019 pages of records in their entirety and 155 pages of

records with redactions. *See* Suzuki Decl. ¶ 15. Thus, the Court finds that as to the information withheld pursuant to Exemptions 3, 6, 7(C), and 7(E), the defendants have released all segregable information. *See Waterman v. IRS*, 755 F. App'x 26, 28 (D.C. Cir. 2019) (per curiam) (vacating decision granting agency's motion for summary judgment due to district court's error in "approv[ing] the government's withholding of information under the FOIA without making an *express* finding on segregability." (emphasis in original) (internal quotation mark omitted) (quoting *PHE Inc. v. Dep't of Justice*, 983 F.2d 248, 252 (D.C. Cir. 1993)).

Finally, the FOIA Improvement Act of 2016 added another provision that concerns segregability. "An agency shall . . . (I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible . . . and (II) take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). As noted, the D.C. Circuit has already interpreted subsection (b) of FOIA as satisfied by affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions." *Johnson*, 310 F.3d at 776 (internal quotation marks omitted). The FOIA Improvement Act appears to require no more than that, and therefore the defendants have also satisfied this requirement as to the information withheld pursuant to Exemptions 3, 6, 7(C), and 7(E).

IV.    **CONCLUSION**

For the foregoing reasons, the defendants' Motion for Summary Judgment, ECF No. 14, is GRANTED in part and DENIED in part. The defendants are granted partial summary judgment for withholdings under Exemptions 3, 6, 7(C), and 7(E). The defendants' motion is otherwise DENIED without prejudice, as is Plaintiff's Cross-Motion, ECF Nos. 15, 16.

33

The parties are directed to submit, by January 31, 2020, a joint status report (1) informing the Court as to the progress, if any, the parties have made to narrow the issues in dispute and (2) proposing a schedule to govern further proceedings in this matter.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 31, 2019

_____
BERYL A. HOWELL
Chief Judge